921 F.2d 1047
 59 USLW 2415, 19 Fed.R.Serv.3d 530,
64 Ed. Law Rep. 1038
 Kenneth ROBERTS, Marc Nelson, and Zay Nelson, Parents and
Next Friends of Kelly Nelson and Amy Nelson, and
Debra J. White, Parent and Next Friend
of Kelly White, Plaintiffs-Appellants,
v.
Kathleen MADIGAN and Adams County School District No. 50,
Defendants-Appellees,
Anti-Defamation League of B'Nai B'Rith, American Civil
Liberties Union Foundation of Colorado, Inc., and
American Jewish Congress, Amici Curiae.
 No. 89-1014.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 17, 1990.
 
 Jordan W. Lorence of Concerned Women for America Legal Foundation, Washington, D.C. (Cimron Campbell and Mark N. Troobnick of Concerned Women for America Legal Foundation, Washington, D.C., Wendell R. Bird, Atlanta, Ga., and Roger Westlund, Thornton, Colo., with him on the briefs), for plaintiffs-appellants.
 Martin Semple (Franklin A. Nachman with him on the brief), Semple & Jackson, P.C., Denver, Colo., for defendants-appellees.
 Phillip S. Figa and Candace C. Figa of Burns & Figa, P.C., Bradley A. Levin of Breit, Best, Richman & Bosch, P.C., Denver, Colo., for amicus curiae.
 Jeffrey P. Sinensky, Steven M. Freeman, Richard E. Shevitz, and Meyer Eisenberg of Anti-Defamation League of B'Nai B'rith, and Professor Ruti Teitel, New York Law School, New York City, of counsel, on the brief, for amicus curiae, Anti-Defamation League of B'Nai B'rith.
 John Preston Baker of Coghill & Goodspeed P.C., Robert W. Thompson, Jr., and David Miller, Legal Director, American Civ. Liberties Union of Colorado, Denver, Colo., on the brief, for amicus curiae, American Civ. Liberties Union of Colorado.
 Marc D. Stern, Lois C. Waldman, Amy Adelson, and Jeremy S. Garber, American Jewish Congress, New York City, on the brief, for amicus curiae American Jewish Congress.
 Before McKAY and BARRETT, Circuit Judges, and O'CONNOR,[1] Chief District Judge.
 McKAY, Circuit Judge.
 
 
 1
 This is an appeal from a judgment by the district court denying plaintiffs' claims for damages and all but one claim for injunctive relief against defendants Kathleen Madigan and the Adams County School District No. 50.
 
 I. Facts
 
 2
 Plaintiff Kenneth Roberts is a fifth-grade school teacher at the Berkeley Gardens Elementary School in Denver, which is part of the Adams County School District No. 50. Kelly Nelson, Amy Nelson, and Kelly White are or were students at Berkeley Gardens Elementary. Plaintiffs Marc and Zay Nelson are the parents of plaintiffs Kelly and Amy Nelson. Plaintiff Debra Jean White is the parent of plaintiff Kelly White. None of the plaintiff students were enrolled in Mr. Roberts' class at the time this suit was filed, although Kelly Nelson was previously in Mr. Roberts' class. Defendant Kathleen Madigan is the principal at Berkeley Gardens.
 
 
 3
 As part of his classroom curriculum, Mr. Roberts spent a significant amount of time teaching reading skills to his fifth graders. One method he used to teach the value of reading was to devote fifteen minutes each day to a "silent reading period." During this silent reading period, students were allowed to choose their own reading materials; they could have been brought from the students' homes, chosen from the school library, or selected from Mr. Roberts' classroom library. The classroom library was a collection of about 239 books of varying content that Mr. Roberts had compiled over his nineteen years of teaching. In order to set an example for the students, Mr. Roberts silently read his own materials during the silent reading time.
 
 
 4
 Frequently, the book Mr. Roberts chose to read silently was the Bible, which he kept on his desk throughout the school day. Mr. Roberts never read from the Bible aloud nor overtly proselytized about his faith to his students. Mr. Roberts also displayed a poster in his classroom that read, "You have only to open your eyes to see the hand of God." The trial court found that, in context, Mr. Roberts' Bible reading, the poster, and the presence of two Christian books in Mr. Roberts' classroom library created the appearance that Mr. Roberts was seeking to advance his religious views.
 
 
 5
 The events leading to this litigation took place during the 1987-88 school year. On September 10, 1987, a parent/teacher open house was held, at which time a parent complained to Principal Madigan about the presence of two Christian religious books on the shelves of Mr. Roberts' classroom library. The two books are titled The Bible in Pictures and The Life of Jesus.[2] That same evening, Ms. Madigan entered Mr. Roberts' classroom, perused the two books, and directed Mr. Roberts to remove them from the classroom library. Ms. Madigan did not ask Mr. Roberts how the books were being used before she ordered their removal. She explained to Mr. Roberts that "separation of church and state" required that the books be removed. Ms. Madigan also noticed the Bible that Mr. Roberts kept on his desk and requested that he keep it out of sight during classroom hours. Mr. Roberts immediately complied with the directive.
 
 
 6
 Ms. Madigan testified that she had spoken to Mr. Roberts on two previous occasions concerning the Bible on his desk. In September of 1986, Ms. Madigan made a routine visit to Mr. Roberts' classroom and observed him reading his Bible silently. Ms. Madigan told him at that time that she expected him to keep the Bible off his desk between 8:00 a.m. and 3:30 p.m. Later, in November 1986, Ms. Madigan again visited Mr. Roberts' classroom and found him reading his Bible. She repeated her earlier admonition that he should keep his Bible in his desk during school hours.
 
 
 7
 On September 14, 1987, a few days after Ms. Madigan ordered Mr. Roberts to remove the two books from his classroom, Mr. Roberts discussed the matter with Principal Madigan. Mr. Roberts questioned the propriety of Ms. Madigan's directive and asked her for any written school district guidelines or policies that he had violated or that would enlighten him as to what types of materials he could keep in his classroom. Ms. Madigan denied his request and simply stated that common sense and her previous remarks were sufficient.
 
 
 8
 On September 18, 1987, Mr. Roberts gave Ms. Madigan a written memorandum asking her to reconsider her directive. In the memorandum, Mr. Roberts again asked Ms. Madigan for any written guidelines the school district had pertaining to censorship of books and placement of items on teachers' desks. Ms. Madigan discussed the matter with various school officials but did not change her position. On September 24, 1987, Mr. Roberts met with Principal Madigan, Michael Bassett, the head of personnel for the school district, and Anita Ratliff, the other fifth-grade teacher at Berkeley Gardens Elementary. At the meeting, Ms. Madigan and Mr. Bassett gave Mr. Roberts a written directive reaffirming Ms. Madigan's earlier instructions stating: "The law is clear that religion may not be taught in a public school. To avoid the appearance of teaching religion, I have given you this directive. Failure to comply with this directive will be considered insubordination and could result in disciplinary action." Record, vol. 1, doc. 1, at 14. Mr. Roberts later appealed to the district superintendent, Mr. Masarotti, but Mr. Masarotti did not override the directive handed down by Ms. Madigan.
 
 
 9
 In addition to the action taken in Mr. Roberts' classroom, plaintiffs alleged that sometime in September 1987, Ms. Madigan visited the school library at Berkeley Gardens Elementary and removed a Bible from the library shelves. Defendants contended the Bible was not removed by Ms. Madigan. They stipulated at trial, however, that the Bible would be replaced and not removed again.
 
 
 10
 Mr. Roberts, along with the plaintiff students and their parents, brought this action seeking damages and injunctive relief against Ms. Madigan and the school district. Plaintiffs based their claim on the theory that the school district, by ordering the two books off Mr. Roberts' shelf, by directing him to keep his Bible out of sight during school hours, and by removing the Bible from the school library, violated the plaintiffs' first amendment rights of free speech, academic freedom, and access to information. Plaintiffs also asserted that the district's actions violated the Establishment Clause by treating Christianity in a non-neutral, disparaging manner.
 
 
 11
 After a trial before the district court, the court ordered the school district to return the Bible to the Berkeley Gardens school library. Concerning Ms. Madigan's actions in Mr. Roberts' classroom, however, the court concluded not only that the school district acted properly but that the Establishment Clause required such action. See Roberts v. Madigan, 702 F.Supp. 1505, 1514-17 (D.Colo.1989). Accordingly, the court went on to conclude that the district did not violate the principle of government neutrality toward religion, but that it simply acted appropriately in its effort to prevent Mr. Roberts from teaching religion. See id. As for the plaintiffs' free speech claims, the court held that in the balance between Mr. Roberts' rights to freedom of expression and academic freedom on the one hand, and the students' rights to be free from religious indoctrination on the other, the students' interests must prevail. Consequently, the court rejected Mr. Roberts' free speech arguments and denied the relief he sought. Finally, the court dismissed the student plaintiffs' claims and the claims of their parents for lack of standing. The court noted that none of the student plaintiffs were in Mr. Roberts' class at the time their suit was filed.
 
 II. Standing of Parents and Students
 
 12
 The district court dismissed the parents' and students' claims for lack of standing. Plaintiffs now argue that the district court erred in its assessment of the students' and parents' standing to assert claims for both injunctive relief and damages.
 
 
 13
 At the outset, we note that in order to satisfy the Article III "case or controversy" requirement, the students and parents must allege that they have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Thus, standing has been held to exist only if the aggrieved party makes a two-fold showing. First, the plaintiffs must show that they have suffered a "distinct and palpable injury." Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978). Second, the plaintiffs must demonstrate a causal link between the claimed injury and the challenged conduct. Id. This second prong may be satisfied by showing that there is a substantial likelihood that the relief sought will address the claimed injury. See id at 75 n. 20, 98 S.Ct. at 2631 n. 20; Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 43, 96 S.Ct. 1917, 1926-27, 48 L.Ed.2d 450 (1975).
 
 
 14
 In this case, the district court dismissed the parents' and students' claims because none of the students were in Mr. Roberts' class at the time this law suit was filed. We now address separately the standing issues with respect to injunctive relief and damages.
 
 A. Injunctive Relief
 
 15
 Plaintiffs argue that the school district's removal of the two books and its order requiring Mr. Roberts to cease his silent Bible reading give the students and parents standing to seek injunctive relief. Plaintiffs claim that because all the students involved are or have been enrolled at Berkeley Gardens, they all have standing to challenge state action that touches Mr. Roberts' classroom. In support of this argument, plaintiffs cite a number of cases in which students and their parents were found to have standing to challenge alleged first amendment violations in the public schools. See Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (Alabama statute authorized one-minute period of silence for prayer or meditation each day in all public schools); School District of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Pennsylvania law required ten verses of Bible to be read at beginning of each school day in each class); McCollum v. Board of Educ., 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (religious instruction carried out in all classrooms for a certain period each week); Bell v. Little Axe Indep. School Dist. No. 70, 766 F.2d 1391 (10th Cir.1985) (weekly religious meetings held on school premises, supervised by teachers, and advertised on school premises by posters and in school publications). We agree that each case cited by plaintiffs supports the notion that students and their parents may challenge unconstitutional actions in the public schools that directly affect the students. The cases cited, however, are distinguishable from the present case because each involved religious activities occurring school wide or within the plaintiffs' own classrooms. Because none of the students involved in this suit were in Mr. Roberts' class at the time this suit was filed, none of the students, and therefore none of their parents, were directly affected by the district's actions in Mr. Roberts' classroom.[3] We thus conclude that none of the students or parents satisfy the two-prong standing requirement set forth above.
 
 
 16
 Kelly White and Amy Nelson were both too young to be in Mr. Roberts' class at the time of this suit. There is no more than a speculative likelihood that either of these students will be in his class in the future. Accordingly, we conclude that Kelly White and Amy Nelson fail to satisfy the first prong of the standing requirement because they can demonstrate no "distinct and palpable injury" caused by the district's directive to Mr. Roberts. In this regard, we find persuasive the district court's observation that the students "cannot claim First Amendment violations for the removal of books to which they did not have access, nor for actions against a teacher in whose class they were not enrolled." Roberts v. Madigan, 702 F.Supp. 1505, 1519 (D.Colo.1989).
 
 
 17
 Kelly Nelson, who was in Mr. Roberts' class at the time of the school district's directive, presents a closer standing question. She nevertheless fails to show standing. Because Kelly Nelson had graduated from Mr. Roberts' class before this suit was filed,[4] she fails to satisfy the second of the two standing requirements.[5] Although Kelly Nelson would have had access to the two Christian books were it not for the actions of the school district, she nevertheless lacks standing because injunctive relief cannot redress her injury now that she is no longer in Mr. Roberts' class.
 
 B. Damages Claims
 
 18
 Plaintiffs argue that the district court erroneously ignored the existence of their damages claims when it dismissed them for lack of standing. We recognize that standing may exist where a claim for damages is still alive despite mootness or lack of standing for injunctive relief. Cf. Ellis v. Brotherhood of Ry., Airline & Steamship Clerks, Freight Handlers, Express & Station Employees, 466 U.S. 435, 441-43, 104 S.Ct. 1883, 1888-90, 80 L.Ed.2d 428 (1984); Powell v. McCormack, 395 U.S. 486, 495-500, 89 S.Ct. 1944, 1950-53, 23 L.Ed.2d 491 (1969); Bell v. Little Axe Indep. School Dist. No. 70, 766 F.2d 1391, 1398-99 (10th Cir.1985). Because the students and parents sought damages as well as injunctive relief, Kelly Nelson would appear to have standing to challenge the district's actions in Mr. Roberts' classroom. We note, however, that plaintiffs failed to preserve their damages claims at the trial level.
 
 
 19
 The district court, pursuant to plaintiffs' motion for preliminary injunction, held a consolidated hearing for both preliminary and permanent injunction. At the close of those proceedings, the court requested post-hearing briefs on a number of issues. See Record, vol. 2, at 198-200. Included among those issues was the issue of the students' and parents' standing. After considering the evidence adduced at the hearing and the briefs submitted, the district court dismissed all the students' and parents' claims for lack of standing.
 
 
 20
 We have examined the post-hearing briefs submitted to the district court. There is no discussion in the plaintiffs' brief concerning their damages claims and how the existence of those claims affected standing. In order to review an issue on appeal, we require the specific issue to be raised before the district court. "It is well established in this circuit that 'a party may not sit idly by, watching error being committed, and then raise the claimed error on appeal without having accorded the trial court the opportunity to correct its action.' " Chevron, U.S.A., Inc. v. Hand, 763 F.2d 1184, 1186 (10th Cir.1985) (quoting Gundy v. United States, 728 F.2d 484, 488 (10th Cir.1984)). In Gundy we stated that "failure to raise the issue with the trial court precludes any review except for the most manifest error." Gundy, 728 F.2d at 488. See also Burak v. General American Life Ins. Co., 836 F.2d 1287, 1291 (10th Cir.1988); United States v. Troutman, 814 F.2d 1428, 1444 (10th Cir.1987); United States v. Diaz-Albertini, 772 F.2d 654, 657 (10th Cir.1985). Plaintiffs did not raise the issue of standing based on their damages claims at the hearing or in their post-hearing briefs. Moreover, when the district court dismissed all the parents' and students' claims, plaintiffs made no post-judgment motion suggesting that their damages claims preserved the parents' and students' standing. Accordingly, the students' and parents' damages claims cannot now form the basis for urging standing. We do not find the district court's finding that plaintiffs lacked standing on this issue to be manifest error.
 
 
 21
 For the reasons set forth above, we hold that the district court properly dismissed the students' and parents' claims for lack of standing. Nevertheless, we address the merits of Mr. Roberts' claims, which are largely equivalent to the claims asserted by the students and parents.
 
 III. Establishment Clause
 
 22
 Mr. Roberts claims that the school district violated the Establishment Clause by: (1) removing The Bible in Pictures and The Story of Jesus from the classroom library, (2) ordering Mr. Roberts not to read his Bible in the classroom during school hours, (3) ordering Mr. Roberts to keep his Bible off his desk during school hours, and (4) removing the Bible from the school library.[6] The district court examined each of the challenged actions and concluded that, with the exception of the Bible in the school library, the school district had not violated the Establishment Clause.
 
 
 23
 The proper relationship between religion and the state under the Establishment Clause[7] is difficult to determine. Clearly, religion is a pervasive force in our society. "This is not to say, however, that religion has been so identified with our history and government that religious freedom is not likewise as strongly imbedded in our public and private life." School District of Abington Township v. Schempp, 374 U.S. 203, 214, 83 S.Ct. 1560, 1567, 10 L.Ed.2d 844 (1963). Here, we face the difficulty of determining the proper balance between the freedom from religious coercion created by state-sponsored religion and the inescapable reality that our culture is permeated by religious symbols and rituals. Nowhere has the proper line of demarcation been more difficult to define than in our nation's public schools.
 
 
 24
 Over the years, the Supreme Court has developed a three-part test for determining the propriety of state action under the Establishment Clause as it applies to the states through the fourteenth amendment.[8] First, state action must have a secular purpose. Second, the primary effect of any state action must be one that neither advances nor inhibits religion. Finally, state action must not foster excessive government entanglement with religion. Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). The first two criteria thus require that governmental action be neutral with respect to religion, both in purpose and primary effect. This requirement of government neutrality prohibits governmental action whose purpose or effect is to suppress religion as well as action that advances it. See Wallace v. Jaffree, 472 U.S. 38, 56, n. 42, 105 S.Ct. 2479, 2489, n. 42, 86 L.Ed.2d 29 (1985). Against this background, we now consider the constitutionality of the school district's conduct in the case at bar.
 
 A. The School District's Purpose
 
 25
 At trial, Mr. Roberts claimed that the school district acted against him in order to disapprove of Christianity. The district court, however, found that the school district had a secular purpose in taking the challenged actions. Having examined the record, we do not hold the district court's finding clearly erroneous.
 
 
 26
 The only evidence relating to the school district's motives indicates that the district simply wanted to prevent Mr. Roberts from violating the Establishment Clause. When asked whether Ms. Madigan gave any reason for her directive of September 10, 1987, Mr. Roberts testified that Ms. Madigan told him it was necessary "because of separation of church and state." Record, vol. 2, at 28. Further, when Mr. Roberts asked Ms. Madigan for written guidelines and policies that he had violated, Ms. Madigan responded with a brief written directive. The directive stated her sole purpose as follows: "The law is clear that religion may not be taught in a public school. To avoid the appearance of teaching religion, I have given you this directive." Record, vol. 1, doc. 1, at 14. We find no evidence in the record that suggests a purpose for the district's action other than that stated in the written directive. We therefore affirm the district court's finding that the school district had a secular purpose for its actions, namely, to assure that none of Mr. Roberts' classroom materials or conduct violated the Establishment Clause.[9] The Supreme Court has held that the state is constitutionally required to see that state-supported activity is not used for religious indoctrination. See Levitt v. Committee for Public Education & Religious Liberty, 413 U.S. 472, 480, 93 S.Ct. 2814, 2819, 37 L.Ed.2d 736 (1973); Lemon, 403 U.S. at 619, 91 S.Ct. at 2114. See also Breen v. Runkel, 614 F.Supp. 355, 358 (W.D.Mich.1985). Cf. Board of Educ. v. Mergens, --- U.S. ----, 110 S.Ct. 2356, 2371, 110 L.Ed.2d 191 (1990); Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 335-36, 107 S.Ct. 2862, 2868-69, 97 L.Ed.2d 273 (1987); Gillette v. United States, 401 U.S. 437, 453, 91 S.Ct. 828, 838, 28 L.Ed.2d 168 (1971).
 
 B. Primary Effect
 
 27
 Mr. Roberts further challenges the school district's actions arguing that regardless of the district's motives, the actual effect of Ms. Madigan's directive was a disparagement of Christianity. As we examine the school district's conduct under the "effect" prong of the Lemon test, we again point out that public school officials "must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion." Lemon, 403 U.S. at 619, 91 S.Ct. at 2114. As Mr. Roberts correctly notes, however, school officials must carry out this duty in a way that neither endorses nor disparages a particular religion or religion in general. Indeed, the Supreme Court has repeatedly stated that the effect prong is not satisfied if official action, regardless of its purpose, "conveys a message of endorsement or disapproval" of religion. Wallace v. Jaffree, 472 U.S. 38, 56 n. 42, 105 S.Ct. 2479, 2489 n. 42, 86 L.Ed.2d 29 (1985); School District of Grand Rapids v. Ball, 473 U.S. 373, 389, 105 S.Ct. 3216, 3225-26, 87 L.Ed.2d 267 (1985); Lynch v. Donnelly, 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984).
 
 
 28
 Mr. Roberts contends that the district, by removing the two Christian books and the Bible from the classroom, necessarily conveyed a message of disapproval toward Christianity. He notes that the school district removed only the two Christian books and disallowed Mr. Roberts' reading of only the Bible in class. At trial, testimony showed that while the school district removed The Bible in Pictures and The Story of Jesus from the classroom library, the district ignored the presence of books dealing with Greek gods and goddesses and American Indian religions. The evidence also indicates that the school district did not allow Mr. Roberts to read his Bible or keep it on his desk, but nevertheless allowed him to teach actively about Navajo Indian religion. Mr. Roberts was also allowed to read silently a book dealing with the life of Buddha and keep it on his desk for some period.
 
 
 29
 Because the school district allegedly treated the Christian materials differently than any other materials, Mr. Roberts concludes that the primary effect of the district's action must have been a disparagement of Christianity. Mr. Roberts infers that "[t]he school's actions do not convey a message of obeying the Establishment Clause, because then the school district would have removed all religious books, and prohibited teachers from silently reading any religious book." Brief of Appellants at 23.
 
 
 30
 Mr. Roberts' argument sweeps much too broadly. Were we to accept his characterization of the school district's actions, any official removal of specific religious materials from public schools would necessarily be considered non-neutral toward religion. The fallacy of this position is exposed when we recognize that all corrective actions taken to assure that individual teachers do not teach religion must be aimed at the specific religions or value systems being taught. The removal of materials from the classroom is acceptable when it is determined that the materials are being used in a manner that violates Establishment Clause guarantees. Thus, the Establishment Clause focuses on the manner of use to which materials are put; it does not focus on the content of the materials per se. For example, the books about American Indian religion could be used in violation of the Establishment Clause if they were taught in a proselytizing manner. Because they were not so used, however, those books do not violate the Establishment Clause by the very existence of their content. It is neither wise nor necessary to require school officials to sterilize their classrooms and libraries of any materials with religious references in order to prevent teachers from inculcating specific religious values. Instead, school officials must be allowed, within certain bounds, to exercise discretion in determining what materials or classroom practices are being used appropriately. "[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 507, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969).
 
 
 31
 Considering the evidence, we affirm the district court's finding that the primary effect of the school's actions was not to disapprove of Christianity. The mere fact that the actions were aimed exclusively at Christian religious materials does not automatically mean the actions' primary effect was to send a disapproving message regarding Christianity. If we must draw any message from the actions, that message must be that the school district disapproves of the teaching of Christianity in the public schools. Here, we are particularly mindful, as was the district court, that there is a "difference between teaching about religion, which is acceptable, and teaching religion, which is not." Roberts v. Madigan, 702 F.Supp. 1505, 1517 (D.Colo.1989). Mr. Roberts' avowed purpose for reading his Bible in class was to model reading for the students. Because Mr. Roberts chose to keep his Bible on his desk continuously and read it frequently, Ms. Madigan feared that Mr. Roberts was setting a Christian tone in his classroom. Having formed that impression, Ms. Madigan had a duty to take corrective steps, and to do so in a religiously neutral manner. Ms. Madigan's only stated reasons were that the Christian books and the Bible might violate "separation of church and state" and that "religion may not be taught in a public school." We discern no anti-Christian message here. The school district's conduct thus satisfies the "primary effect" test as well as the "purpose" test under Lemon.
 
 
 32
 None of the parties suggest that the school district's activities involved any excessive entanglement of the state with religion. Accordingly, we hold that the entire Lemon test was fulfilled and the school district did not violate the Establishment Clause by issuing the challenged directive.
 
 IV. Free Speech and Academic Freedom
 
 33
 Mr. Roberts claims that the school district violated his first amendment rights of free speech and academic freedom by removing the two Christian books from the classroom and ordering him to stop reading his Bible in class. According to Mr. Roberts, his Bible reading and the presence of the two Christian books were expressive activities that were protected from content-based censorship under the first amendment.
 
 
 34
 Plaintiffs argue that the school district's conduct violated the student plaintiffs' free speech rights by denying the students access to the two books and the opportunity to observe Mr. Roberts reading his Bible silently in class. We recognize the similarity between the facts of this case and those involved in Board of Educ. v. Pico, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). In Pico, a plurality of the Supreme Court recognized a free speech "right to receive" information and held unconstitutional a school board's censorship of several books from a school library. See Pico, 457 U.S. at 866-67, 102 S.Ct. at 2807-08. Because the student plaintiffs lack standing to challenge the removal of the Christian books, however, we express no opinion regarding the impact of the district's directive on the students' asserted rights to receive ideas. Our holding is therefore limited to the issues regarding Mr. Roberts' rights to self-expression and academic freedom in the classroom.
 
 
 35
 We begin our discussion by noting that "[n]either students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Nevertheless, the Supreme Court has repeatedly emphasized that the rights of students and teachers in the public schools "are not automatically coextensive with the rights of adults in other settings." Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 682, 106 S.Ct. 3159, 3163-64, 92 L.Ed.2d 549 (1986); see Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 266, 108 S.Ct. 562, 567-68, 98 L.Ed.2d 592 (1988). We are thus faced with the tension between Mr. Roberts' right of expression and the need of public school officials to censor classroom materials for the sole purpose of eliminating a possible constitutional violation.
 
 
 36
 We apply the "substantial interference" or "balancing" standard enunciated in Tinker to the competing interests of Mr. Roberts and the school officials. There, the Court concluded that "students may express their opinions at school, even on controversial subjects, so long as they do so without materially disrupting classwork, creating substantial disorder, or invading the rights of others."[10] Tinker, 393 U.S. at 513, 89 S.Ct. at 740. We find no reason here to draw a distinction between teachers and students where classroom expression is concerned. Thus, if the speech involved is not fairly considered part of the school curriculum or school-sponsored activities, then it may only be regulated if it would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." Tinker, 393 U.S. at 509, 89 S.Ct. at 738. If, on the other hand, the conduct endorses a particular religion and is an activity "that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," Kuhlmeier, 484 U.S. at 271, 108 S.Ct. at 569, creating the requisite state action, then the activity infringes on the rights of others and must be prohibited.
 
 
 37
 We return to the factors set forth in Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111, then, to determine whether Mr. Roberts' actions violated the Establishment Clause. The district court, after reviewing the testimony and evidence, correctly found that there was an improper religious purpose behind Mr. Roberts' use of the Bible and the presence of the religious books in his classroom library. Upon analyzing Mr. Roberts' actions within the classroom environment at the time the dispute arose, including the poster on the classroom wall requesting readers to open their eyes to see the hand of God, we agree that the evidence sufficiently demonstrated that Mr. Roberts' actions were prompted by a religious purpose. Although Mr. Roberts testified that he was acting as a role model for his students when he read the Bible, his underlying purpose for reading the Bible was, at best, ambiguous. As the district court noted, Mr. Roberts offered nothing to suggest that his actions were non-religious.[11]
 
 
 38
 We believe that the district court also properly concluded that Mr. Roberts' actions, when viewed in their entirety, had the primary effect of communicating a message of endorsement of a religion to the impressionable ten-, eleven-, and twelve-year-old children in his class.
 
 
 39
 "The meaning of a statement to its audience depends both on the intention of the speaker and on the 'objective' meaning of the statement in the community.... If the audience is large, as it always is when government 'speaks' by word or deed, some portion of the audience will inevitably receive a message determined by the 'objective' content of the statement, and some portion will inevitably receive the intended message. Examination of both the subjective and the objective components of the message communicated by a government action is therefore necessary to determine whether the action carries a forbidden meaning."
 
 
 40
 Lynch, 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring). Here, it is reasonable to conclude that not all of Mr. Roberts' students would receive a purportedly secular message. Mr. Roberts left his personal Bible on his desk in his fifth-grade classroom at all times and read it during class time. Like his Bible, the two other contested books were Mr. Roberts' personal property and were not used as part of the class curriculum. Further, the three books were the only books in the classroom that were demonstrated to contain religious themes; all three pertained to Christianity. Considering these factors in light of the environment of a fifth-grade classroom, the district court properly concluded that the books had the primary effect of advancing religion. See Edwards v. Aguillard, 482 U.S. 578, 584, 107 S.Ct. 2573, 2577-78, 96 L.Ed.2d 510 (1987) (noting that elementary schoolchildren "are impressionable and their attendance is involuntary"). When viewed from the eyes of the children in Mr. Roberts' class, the placement of the two books in the class library, the placement of Mr. Roberts' Bible on his desk, and Mr. Roberts' reading of the Bible during the reading period provided "a crucial symbolic link between government and religion." Grand Rapids School Dist. v. Ball, 473 U.S. 373, 385, 105 S.Ct. 3216, 3223, 87 L.Ed.2d 267 (1985).
 
 
 41
 Under both the purpose and the effect prongs of the Lemon test, the district court properly determined that the censored actions, when viewed in their entirety, violated the Establishment Clause of the first amendment. The censored conduct therefore substantially infringed on the rights of Mr. Roberts' students.[12] Because "[t]he State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion," Lemon, 403 U.S. at 619, 91 S.Ct. at 2114, we conclude that the school district's actions were not constitutionally infirm.
 
 V. Costs
 
 42
 As a final matter, plaintiffs complain that the district court erred when it awarded defendants their entire costs. Plaintiffs note that the district court ordered defendants to return the copy of the Bible to the school library and enjoined them from removing it in the future. Thus, plaintiffs argue that the defendants were not "prevailing parties" on all issues within the meaning of Rule 54(d) of the Federal Rules of Civil Procedure.
 
 
 43
 Under Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed.R.Civ.P. 54(d). We acknowledge that defendants in this case are not "prevailing parties" on the issue relating to the Bible in the school library. Thus, this case presents a situation where both parties have "prevailed" on at least one claim.
 
 
 44
 In reviewing the district court's decision to impose costs, we reverse only for an abuse of discretion. See Howell Petroleum Corp. v. Samson Resources Co., 903 F.2d 778, 783 (10th Cir.1990). In this case, we conclude that the district court's decision to award costs to the party that prevailed on the vast majority of issues and on the issues truly contested at trial was not an abuse of discretion.
 
 
 45
 We first note that the dismissal of most of plaintiffs' claims makes defendants the prevailing party on those issues. 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 2667 (2d ed. 1983). We recently held that it was not an abuse of discretion for a district court to refuse to award costs to a party that was only partially successful. See Howell, 903 F.2d at 783. We now hold that the district court in this case did not abuse its discretion when it awarded full costs to the party prevailing on the majority of claims and the central claims at issue. Other circuits have upheld awards of full costs to a party prevailing in only part of a case. See United States v. Mitchell, 580 F.2d 789, 793 (5th Cir.1978); K-2 Ski Co. v. Head Ski Co., Inc., 506 F.2d 471, 477 (9th Cir.1974). Our holding is based on the broad discretion of the district court. As Professor Moore has noted, under Rule 54 the district court has discretion to award costs to a nonprevailing party. J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice Sec. 54.70 (2d ed. 1988). "[W]here the court exercises its discretion the identification of the prevailing party may become so unimportant as to be almost immaterial." Id. Accordingly, we affirm the district court's exercise of its discretion in awarding costs to defendants.VI. Conclusion
 
 
 46
 Mr. Roberts' Establishment Clause claims fail because the school district acted for the valid purpose of preventing him from promoting Christianity in a public school. Moreover, the primary effect of the school district's actions was not to send a message of disapproval of Christianity. If we must draw any message from the district's actions, then that message must be that the district properly disapproves of classroom activity that appears to promote a particular set of religious concepts.
 
 
 47
 As for Mr. Roberts' free speech and academic freedom arguments, we conclude that the district's removal of two Christian books from the classroom shelves and its directive ordering Mr. Roberts to cease his silent Bible reading in the classroom did not violate the first amendment. Mr. Roberts' conduct, in the context of a fifth-grade class full of impressionable children, had the purpose and effect of communicating a message of endorsement of religion in a manner that might reasonably be perceived to bear the imprimatur of the school.
 
 
 48
 We conclude further that the district court correctly dismissed the claims of the student and parent plaintiffs for lack of standing. None of the students were in Mr. Roberts' class at the time this suit was filed. Thus, none of the students had standing for purposes of injunctive relief. Although the students and parents also asserted claims for damages, plaintiffs failed to preserve those claims for appeal. We thus affirm the district court's dismissal of all the student and parent plaintiffs' claims.
 
 
 49
 Finally, we conclude that the district court did not abuse its discretion when it awarded the defendants their costs.
 
 
 50
 The judgment of the district court is therefore AFFIRMED.
 
 BARRETT, Senior Circuit Judge, dissenting:
 
 51
 I respectfully dissent.
 
 
 52
 The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof...." The Founding Fathers were specially concerned that these United States would not labor under a state sponsored church or religion. The United States Supreme Court has made it abundantly clear that the Constitution does not require complete separation of church and state and that it "[a]ffirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any. See, e.g., Zorach v. Clauson, 343 U.S. 306-314, 315, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952); Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 211, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948)." Lynch v. Donnelly, 465 U.S. 668, 673, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984). I believe that those mandates were violated by Principal Madigan and the School District in this case. Their actions forbidding Mr. Roberts from reading his Bible during his fifth grade class' 15-minute silent reading period and ordering the removal of the two challenged books from his classroom library were acts of intolerance, lack of accommodation and hostility toward the Christian religion.[1]
 
 
 53
 There is no assertion by Mr. Roberts that his reading the Bible during the class silent reading period was an exercise compelled by his religious beliefs. See Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). By the same token, this is not a case involving a religious practice in violation of a state statute. Employment Div., Oregon Dept. of Human Resources v. Smith, --- U.S. ----, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (claimed religious use of peyote cannot prevail under the Free Exercise Clause in light of Oregon's statute declaring it a felony to knowingly possess the drug); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879) (religious belief in polygamy cannot prevail over state criminal statute outlawing the practice). Thus, in the instant case, none of Mr. Roberts' practices constituted any per se violation of any Colorado law, custom or policy. Accordingly, the district court should have judged the case with a view to accommodate Mr. Roberts' practices. The burden was cast on the school district to demonstrate, as the majority opinion now agrees, that Mr. Roberts' challenged practices materially and substantially interfered with the operation of the school. This burden is analogous to the "compelling governmental interest" test announced in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), which requires that religious liberty under the Free Exercise Clause of the First Amendment cannot be interfered with or encroached upon, directly or indirectly, unless required by clear and compelling governmental interests "of the highest order." Yoder, 406 U.S. at 215, 92 S.Ct. at 1533.
 
 
 54
 It is a far cry from tolerance and accommodation toward Christianity to interpret the practices in Mr. Roberts' classroom as "teaching" or "endorsement" of Christianity in violation of the Establishment Clause. I observe that such findings by the district court, which the majority here upholds under either the clearly erroneous standard or the de novo standard, have no basis in any aggrieved testimony of fifth grade students or their parents, past or present. The only "live" complainant in this case was Principal Madigan, whose views on separation of church and state are absolute. She applied a "bright line" approach. The district court's "findings" are really legal conclusions. There is no basis, other than speculation, for implying, as does the majority opinion, that the practices in Mr. Roberts' classroom constituted religious indoctrination. (Maj. Opinion, pp. 1054-1055). Presumably, such would not have been the case had Mr. Roberts read the books on Buddhism or Indian religions. Principal Madigan did not object to them. Thus, it seems that any concern that elementary children are "vastly more impressionable than high school or university students," (Appellee's Briefs, p. 32), cannot be a serious defense. In this case, it was Principal Madigan and the School District who violated the Establishment Clause.
 
 
 55
 In the following Supreme Court opinions interpretive of the Establishment Clause in the context of the public schools, it is important to note that the condemned activity was openly pursued or actively--rather than passively--sponsored: Stone v. Grahamn, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199, reh. denied, 449 U.S. 1104, 101 S.Ct. 904, 66 L.Ed.2d 832 (1980) (held that the posting of a copy of the Ten Commandments on the wall of each public school room violated the Establishment Clause because no secular purpose had been demonstrated); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (formulated prayers which were required to be repeated by students in public schools violated Establishment Clause); McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (released time arrangement whereby students who wished could attend religious instruction classes during regular school hours in public school buildings, held to be violative of Establishment Clause by virtue of use of tax-supported property to promote religion).
 
 
 56
 In those cases where a religious exception has not been allowed from a state statute or regulation, the Supreme Court has cast the burden on the government to rely on more than mere speculation about potential harms; the government has been required to present evidentiary support for a refusal to allow a religious exception. United States v. Lee, 455 U.S. 252, 257-258, 102 S.Ct. 1051, 1055-1056, 71 L.Ed.2d 127 (1982) (The government must demonstrate that unbending application of its regulation to a religious objector is essential to accomplish an overriding governmental interest); Thomas v. Review Board of Indiana Employment Security Div., 450 U.S. 707, 719, 101 S.Ct. 1425, 1432-1433, 67 L.Ed.2d 624 (1981), (rejected the state's reasons for refusing to grant a religious exemption for failure to demonstrate that the means employed were the least restrictive means of achieving a compelling state interest because no evidence in the record supported the state's reasons).
 
 
 57
 Cases involving the challenges presented here must necessarily be decided on a case-to-case basis. A person in Mr. Roberts' position as an elementary school classroom teacher must be alert to the possibility that actions on his part could constitute government actions violative of the Establishment Clause without further evidence. For example, in a less discreet classroom scenario than that presented in the case at bar, a violation could be found to exist. However, unlike Stone, Engel, and McCollum, the activities here were passive and de minimis. If the condemned activities in this case could, by simple inference, be held to be violative of the principle of separation of church and state, reliance would necessarily have to weigh almost entirely on the proposition that Mr. Roberts' fifth graders were ages 10 or 11 and thus easily proselytized. The problem is simply that there is no evidence to support such a bald conclusion. No students or parents testified in support of Principal Madigan or the School District. No witness protested that Mr. Roberts' practice of reading from his Bible or the maintenance in his classroom library of the two condemned books were motivated by Mr. Roberts' intention to promote belief in Christianity. Under these circumstances and on the record made, I would hold that the activities did not amount to an intrusion on the separation of church and state principle.
 
 
 58
 Where disputes arise over government restrictions on a person's exercise of a religious practice (here, Mr. Roberts' desire to read from his Bible during the silent 15-minute class reading period), the court must determine whether the government has demonstrated a compelling interest in enforcing its policy (here, Principal Madigan's separation of church and state principle) and whether the policy represents the least restrictive means of fulfilling the governmental interest. Wisconsin v. Yoder, supra; Sherbert v. Verner, supra. Although he does not specifically so argue, Mr. Roberts' practice of reading his Bible during the class 15-minute silent reading period was a minimal, discreet exercise of the Free Exercise Clause of the First Amendment. As such, Principal Madigan and the School District unduly burdened Mr. Roberts' rights. See Hernandez v. Commissioner, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989); Wisconsin v. Yoder, supra, 406 U.S. at p. 220, 92 S.Ct. at p. 1535-36.
 
 
 59
 The majority has come to agree that the "substantial interference" standard of review set forth in Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), applies here. In Tinker, three public school pupils were suspended from school for violating a school policy, with which they were aware, by wearing black armbands in protest of the government's policy in Vietnam. The students were quiet and passive, just as was Mr. Roberts, and they did not impinge upon the rights of others. There is no evidence that Mr. Roberts' actions impinged upon the rights of others.
 
 
 60
 The Tinker court observed that the armband display "does not concern aggressive, disruptive action or even group demonstrations" and that there was no evidence that the armband display interfered with school work or collided with the rights of other students to be let alone. Id. at 508, 89 S.Ct. at 737. By the same standard, there is no evidence that Mr. Roberts' actions interfered with school work or collided with the rights of the students. Tinker required evidence demonstrating that "[e]ngaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school....' " Id. at 509, 89 S.Ct. at 738. There is not a scintilla of evidence in the case at bar demonstrating that any of Mr. Roberts' practices materially and substantially interfered with the appropriate operation of the school. Thus, I submit that, under the strict Tinker standard, the defendants-appellants failed to carry their burden of proof.[2] This is a case in which to promote tolerance. In my view, under the strict standard of Tinker, the defendants failed to prove that Mr. Roberts' behavior "materially and substantially interfere[d] with ... the operation of the school." Tinker, 393 U.S. at 509, 89 S.Ct. at 738.
 
 
 61
 The maintenance of the two challenged books in Mr. Roberts' classroom library was entirely passive in character, just as was Mr. Roberts' practice of reading his Bible during the class' 15-minute silent reading period. These books were not assigned to the students and there is no evidence that Roberts ever referred the students to them. Furthermore, Roberts' practice of reading his Bible while seated at his desk during the class 15-minute silent reading period was carefully exercised. Under these circumstances, the School District did not prove that there was a compelling governmental interest justifying its command that Mr. Roberts refrain from reading his Bible during the 15-minute silent reading period, and remove the two books from the classroom library. "First Amendment rights must always be applied in light of the special characteristics of the ... environment in the particular case." Tinker, 393 U.S. at 506, 89 S.Ct. at 736.
 
 
 62
 In Lynch v. Donnelly, supra, the Supreme Court majority observed:
 
 
 63
 The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded that there was no question that the statute or activity was motivated wholly by religious considerations. See, e.g., Stone v. Graham, supra, [449 U.S. 39] at 41 [101 S.Ct. 192, 193-94, 66 L.Ed.2d 199;] Epperson v. Arkansas, 393 U.S. 97, 107-09 [89 S.Ct. 266, 272-73, 21 L.Ed.2d 228] (1968); Abington School District v. Schempp, supra, [374 U.S.] at 223-224 [83 S.Ct. at 1572;] Engel v. Vitale, 370 U.S. 421, 424-425 [82 S.Ct. 1261, 1263-64, 8 L.Ed.2d 1285] (1962). Even where the benefits to religion were substantial, as in Everson v. Board of Education, 330 U.S. 1 [67 S.Ct. 504, 91 L.Ed. 711] (1947); Board of Education v. Allen, 392 U.S. 236 [88 S.Ct. 1923, 20 L.Ed.2d 1060] (1968); Walz [v. Tax Comm'n, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) ] supra; and Tilton [v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) ] supra, we saw a secular purpose and no conflict with the Establishment Clause. Cf. Larkin v. Grendel's Den, Inc., 459 U.S. 116 (1982).
 
 
 64
 465 U.S. at 680, 104 S.Ct. at 1362-63.
 
 
 65
 In my view, the Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) test is inapplicable in the instant case, simply because the actions condemned here are not of the type or character sufficient to implicate government entanglement with religion. In reality, out of concern for a "bright line" demand for separation of church and state, the defendants effectively denied Mr. Roberts that degree of tolerance to which he is entitled. At the evidentiary hearing conducted by the district court on the injunction issue, two witnesses, the school's librarian and music teacher, testified that Principal Madigan removed the Bible from the main school library in keeping with her concept of separation of church and state. While the district court did not agree with Principal Madigan's action in removing the Bible from the main school library (the district court enjoined Principal Madigan and the School District from removing the Bible from the school library), the court did uphold her actions, approved by the School District, in ordering Mr. Roberts to remove his Bible from his desk, not to read from his Bible during the 15-minute silent reading period and to remove "The Bible in Pictures" and "The Story of Jesus" from his 239-book classroom library. I would hold that Principal Madigan's actions were constitutionally unwarranted and that the district court was clearly erroneous. Principal Madigan insisted on the obliteration of all Christian books from the school premises. Her extreme stance would convert the "primary effect" prong of the Establishment Clause into governmental disapproval, disparagement and hostility toward the Christian religion.
 
 
 66
 There is nothing in the record demonstrating, in fact, that Mr. Roberts' placement of his personal Bible on his desk, his habit of reading the Bible during the class' 15-minute silent reading period or the placement of the above-referred to books in the classroom library had a coercive effect on or that it tended to proselytize Mr. Roberts' fifth grade students. Any concerns voiced in regard to the Establishment Clause impact are entirely speculative.
 
 
 67
 There is no evidence that Mr. Roberts at any time ever spoke to his students concerning his possession of a Bible or his preference in reading from it. Thus, there is no evidence of any "coercive" effect. Furthermore, there is no evidence that Mr. Roberts ever assigned any members of his fifth grade class to read any of the books in his classroom library, including a book on Buddhism and a book on American Indian religions.
 
 
 68
 In my view, the district court erred in drawing any distinction between the maintenance of the Bible in the school library while denying the simple maintenance of "The Bible in Pictures" and "The Story of Jesus" in the classroom library. Not one word was spoken by Mr. Roberts concerning the Bible, his reading of the Bible, or of the two condemned books in his classroom library which could involve any successful application of the Lemon test in favor of the state out of concern for violation of the Establishment Clause of the First Amendment.
 
 
 69
 In Marsh v. Chambers, 463 U.S. 783, 792, 103 S.Ct. 3330, 3336, 77 L.Ed.2d 1019 (1983), the Supreme Court majority held that the practice of opening each daily session of the Nebraska legislature with a prayer by a chaplain paid by the State did not violate the Establishment Clause of the First Amendment because the practice had become historically accepted as "[p]art of the fabric of our society." Mr. Justice Brennan, joined by Mr. Justice Marshall, dissented. They would hold the legislative prayer practice violative of the Establishment Clause. No one can logically argue that the daily prayer practice in Marsh could meet the test of the first prong of the Lemon v. Kurtzman test, i.e., the statute (or practice) must have a secular legislative purpose. And no justice on the Supreme Court in Marsh raised the contention addressed in Engel v. Vitale, supra, that the legislature's daily prayer imposed an impermissible endorsement of prayer in public facilities or that it had a coercive effect upon non-religious minorities to conform.
 
 
 70
 The 15-minute silent reading period was not a religious exercise. Just as a moment of silence does not endorse prayer over other alternatives, in my view, the fact that Mr. Roberts sometimes used the 15-minute silent reading period reading from his Bible does not, ipso facto, convey a message to his students that they should follow suit.
 
 
 71
 The Free Exercise Clause of the First Amendment mandates that the government not prohibit or interfere with the free exercise of religion. The clause imposes a burden on the government to facilitate the free exercise of religion. In that sense, the government is promoting a religious purpose and if the first and second prongs of the Lemon test were to apply, the Free Exercise Clause would necessarily fall because the government would not be pursuing a secular purpose, and the primary effect would be to advance religion.
 
 
 72
 In Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), the Supreme Court struck down an Alabama statute authorizing a 1-minute period of silence in all public schools for "meditation or voluntary prayer" because the majority held that the established purpose was to endorse religion, and the enactment was not motivated by any clearly secular purpose. The Court majority applied the Lemon test.
 
 
 73
 Then-Chief Justice Warren Burger, in his dissent in Wallace v. Jaffree, made the following pertinent observations with which I agree and which I believe to be fully consistent with the majority opinion in Lynch v. Donnelly, supra, and applicable here:
 
 
 74
 [T]he Court's extended treatment of the 'test' of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) suggests a naive pre-occupation with an easy, bright-line approach for addressing constitutional issues. We have repeatedly cautioned that Lemon did not establish a rigid caliper capable of resolving every Establishment Clause issue, but that it sought only to provide 'signposts....' [O]ur responsibility is not to apply tidy formulas by rote; our duty is to determine whether the statute or practice at issue is a step toward establishing a state religion.
 
 
 75
 * * * * * *
 
 
 76
 [T]he statute does not remotely threaten religious liberty; it affirmatively furthers the values of religious freedom and tolerance that the Establishment Clause was designed to protect. Without pressuring those who do not wish to pray, the statute simply creates an opportunity to think, to plan, or to pray if one wishes--as Congress does by providing chaplains and chapels. It accommodates the purely private, voluntary religious choices of the individual pupils who wish to pray while at the same time creating a time for non-religious reflection for those who do not choose to pray. The statute also provides a meaningful opportunity for school children to appreciate the absolute constitutional right of each individual to worship and believe as the individual wishes. The statute 'endorses' only the view that the religious observances of others should be tolerated and, where possible, accommodated. If the government may not accommodate religious needs when it does so in a wholly neutral and non-coercive manner, the 'benevolent neutrality' that we have long considered the correct constitutional standard will quickly translate into the 'callous indifference' that the Court has consistently held the Establishment Clause does not require. (Emphasis supplied).
 
 
 77
 472 U.S. at pp. 89-90, 105 S.Ct. at pp. 2506-07.
 
 
 78
 I would reverse the judgment of the district court and hold, on the record before us, that plaintiff Roberts has demonstrated that the defendants violated the Establishment Clause by requiring the removal of the two books from his classroom library and by barring him from reading or displaying his Bible during the class' 15-minute silent reading period.
 
 
 
 [1]
 Honorable Earl E. O'Connor, Chief United States District Judge for the District of Kansas, sitting by designation
 
 
 [2]
 The Bible in Pictures is a 320-page volume with over one thousand illustrations. The illustrations are designed to provide both children and adults with a better understanding of the Bible. In the book's preface, the author states: "I pray that this book may bring a fresh vision of Christ, and God's purpose in Him, to you who now read it in the midst of the heartache and frustration of our modern world."
 The Story of Jesus is a 128-page volume that depicts through illustrations and text the birth, life, and resurrection of Jesus Christ. The book concentrates on the teachings of Jesus of Nazareth with the underlying premise that he is the Son of God.
 
 
 [3]
 Plaintiffs argue that the students and parents were directly affected by, and thus have standing to challenge, Ms. Madigan's alleged removal of the Bible from the school library. Following the trial, the district court ordered the district to replace the Bible in the library and to refrain from removing it again. Neither party challenges this part of the district court's order. Accordingly, plaintiffs' standing on that issue is not before us on appeal. In addition, standing to challenge the removal of the Bible does not create standing for plaintiffs to challenge the other actions taken by the school district
 
 
 [4]
 The record indicates that Kelly Nelson was enrolled in Mr. Roberts' class during the 1987-88 school year, which ended in June 1988. See Record, vol. 2, at 98-100. This suit was not filed, however, until November 22, 1988
 
 
 [5]
 We acknowledge that Kelly Nelson's claim for damages would satisfy the "causal link" requirement. It is necessary to note, therefore, that our conclusion here applies only to Kelly Nelson's standing to seek injunctive relief
 
 
 [6]
 We note that, contrary to the argument of defendants, the Bible in the school library was an issue in this case. The parties agreed at the hearing that the Bible should be in the library. However, the issue was not removed from the case until defendants stipulated to remedial steps. This explains the trial court's injunction requiring defendants to replace the Bible and not remove it in the future. Thus, the Bible was in issue, and plaintiffs prevailed on that part of the case
 
 
 [7]
 Under the first amendment, "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I
 
 
 [8]
 It is well-settled that the first amendment prohibitions on congressional action now apply to state action by virtue of the fourteenth amendment due process clause. See Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)
 
 
 [9]
 The appropriate standard of review we should apply to the district court's findings under the Lemon test is not clear. See Friedman v. Board of County Comm'rs of Bernalillo, 781 F.2d 777, 779 n. 2 (10th Cir.1985), cert. denied, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986). Whether it is appropriate to apply a clearly erroneous standard, Lynch v. Donnelly, 465 U.S. 668, 681, 104 S.Ct. 1355, 1363, 79 L.Ed.2d 604 (1984), or a de novo standard, id. at 693-94, 104 S.Ct. at 1369-70 (O'Connor, J., concurring), however, is of no consequence here. We would affirm under either standard
 
 
 [10]
 In Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Supreme Court granted school officials broad discretion when the decision involved "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." Id. at 271, 108 S.Ct. at 569. The Court held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273, 108 S.Ct. at 571. The school district here, however, claims that the books were removed to avoid an Establishment Clause violation rather than for educational or pedagogical reasons. Because the school district asserts a constitutional justification, a claim that this body is well-equipped to evaluate, we do not accord it the same deference as in other cases involving issues that school officials are uniquely qualified to handle
 
 
 [11]
 We note the conflict in the record concerning Ms. Madigan's purpose in prohibiting Mr. Roberts from reading the Bible in class. There is some indication that she did not want him reading anything during class so that he could "be actively involved in teaching children." Record at 117. To the extent that this was her purpose, we uphold her decision as "reasonably related to legitimate pedagogical concerns." Kuhlmeier, 484 U.S. at 260, 108 S.Ct. at 562-64
 
 
 [12]
 In Engel v. Vitale, 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962), the Supreme Court recognized that "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." Such coercive pressure is surely at its peak when the religious minorities are impressionable children who look to their teacher as a role model
 
 
 [1]
 Principal Madigan also requested that Mr. Roberts remove a poster depicting a mountain scene with the inscription: "You have only to open your eyes to see the hand of God." Mr. Roberts complied with the request and, at trial, did not challenge the poster's removal. Thus, the poster should not be considered when determining whether the defendants violated the Establishment Clause by prohibiting Mr. Roberts' other practices. Even if the poster were to be considered, I believe that its nonsectarian reference to "God" is, at best, only minimally relevant to the issue of whether Mr. Roberts was unconstitutionally promoting Christianity in the classroom
 
 
 [2]
 The majority relies on Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) to bolster its position that school officials have broad discretion in controlling school activities (Footnote 10, p. 1056 of Majority Opinion). The problem is that Kuhlmeier differentiated between "personal expression that happens to occur on the school premises" protected under Tinker (which governs Mr. Roberts' practices) and school activities "[t]hat students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." Kuhlmeier, 484 U.S. at 271, 108 S.Ct. at 569. The Tinker standard, it is agreed, controls in this case. The "substantial interference" standard applied in Tinker is far less deferential than the "greater control" standard applied in Kuhlmeier. It is to be noted that Kuhlmeier involved the constitutional right of the high school principal to censor certain articles submitted for publication in the student newspaper. It was in that context that the Supreme Court upheld the principal's actions as being "[r]easonably related to legitimate pedagogical concerns." 484 U.S. at 273, 108 S.Ct. at 571. In the instant case, Principal Madigan's actions did not involve educational concerns calling for the expertise of school officials; on the contrary, she exercised a judgment involving a conflict relating to basic constitutional values