**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 26, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SARA C. DEBORD,

      Plaintiff-Appellant/
      Cross-Appellee,

    v.

MERCY HEALTH SYSTEM OF
KANSAS, INC.,

      Defendant-Appellee/
      Cross-Appellant,

and

LEONARD WEAVER,

      Defendant-Appellee.

Nos. 12-3072 and 12-3109

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 5:10-CV-04055-SAC)**

---

Mark A. Buchanan, Law Office of Mark A. Buchanan, Kansas City, Missouri, for Appellant/Cross-Appellee.

Sharon A. Coberly (Monika D. Jenkins with her on the briefs), Seigfreid Bingham, P.C., Kansas City, Missouri, for Appellee/Cross-Appellant.

---

Before **KELLY**, **MURPHY**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Sara Debord filed suit against her employer, Mercy Health Services of Kansas, for sexual harassment and retaliation in violation of Title VII. Debord claims Mercy knew or should have known that her supervisor created a hostile workplace through unwanted touching and offensive sexual remarks. She also claims that Mercy did not do enough to prevent sexual harassment in the workplace, and that, when she finally reported the harassment, Mercy retaliated by firing her.

After reviewing the evidence at summary judgment, the district court concluded there was no triable issue of material fact. We agree. The record does not disclose that Mercy knew or should have known about Debord's allegations of a hostile workplace, and she has not provided a reasonable explanation for the nearly five years she waited to first report the harassment. Nor is there a genuine dispute about whether Mercy honestly held legitimate reasons for terminating Debord based on its conclusion that she was dishonest and disruptive during Mercy's investigation of allegations about her supervisor's conduct and claims she improperly received extra pay.

Debord resists these conclusions with myriad arguments, but none is sufficiently developed or supported by the record to merit a trial.

Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.[1]

# I.  Background

Debord worked as a nuclear-medicine technician at Mercy Hospital in Independence, Kansas.  Debord's direct supervisor was Leonard Weaver, the hospital's director of radiology.

## A.  *Debord's Allegations of Sexual Harassment*

Soon after Debord was hired in 2004, she contends her supervisor Weaver began regularly placing his hands up her sleeve or down the back of her shirt.[2] According to Debord, this occurred "at least three days a week."  Aplt. App. 169. Weaver claims he was just trying to show her how unusually cold his hands were, but Debord says the touching was sexual harassment.  In any event, Debord did not tell Mercy's management that Weaver was touching her until July 2009.

Debord also says Weaver frequently made offensive sexual comments and advances, such as pulling down the neck of her shirt while she was leaning over a patient, asking her to show him her chest, and using sexually suggestive language

---

[1]  Mercy also raises a cross-appeal for costs.  On this issue, we reverse the district court, as explained below.

[2]  In reviewing the district court's grant of summary judgment, we recite the facts presented in the light most favorable to Debord, the nonmoving party. *See Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1171 (10th Cir. 2013).  It is true that Debord separately moved for summary judgment, but that was against Weaver's counterclaim for defamation, a claim that is not before us in this appeal.

when she wore certain clothing. *Id.* at 174–76. Although Debord told Weaver to stop this behavior, she did not report the misconduct to management.

### B. Debord's Facebook Posts and Mercy's Response

Mercy's management first received notice of this behavior on July 6, 2009, through a publicly available message on Facebook, a website for social networking. Earlier that day, Weaver had criticized Debord and then attempted to hug her. Angered by Weaver's comments, Debord logged onto Facebook and wrote several posts during work hours. The relevant posts said,

> (At 9:00 am) Sara DeBord loves it when my boss adds an extra $600.00 on my paycheck for hours I didn't even work…awesome!!
>
> (At 1:37 pm) Sara DeBord is sooo disappointed…can't believe what a snake my boss is…I know, I know everyone warned me:(
>
> (At 2:53 pm) Oh, it's hard to explain....basically, the MRI tech is getting paid for doing MRI even though he's not registered and myself, nor the CT tech are getting paid for our areas...and he tells me 'good luck taking it to HR because you're not supposed to know that' plus he adds money on peoples checks if he likes them (I've been one of them)…and *he needs to keep his creapy hands to himself*…just an all around d-bag!!

*Id.* at 285–86 (emphasis added).

Many of Debord's co-workers saw these posts, including Weaver. Later that day, Debord met with Mercy's HR Director, Eric Ammons, to discuss a gender-based pay-disparity claim that Debord had recently raised. Weaver

interrupted the meeting to confront Debord about the posts. Ammons asked if Debord authored them, but she denied it. Then Weaver brought his laptop to show Ammons exactly what the posts said. Even though they appeared on Debord's Facebook page, Debord again denied writing them. She explained that anyone could access her Facebook page from her cellular phone, and because she left her phone unattended at times, someone else could have created the posts.

After Weaver left the meeting, Ammons asked Debord about the post that mentioned extra money on her paycheck, and Debord claimed that Weaver had in fact added money to her paycheck around Thanksgiving of 2006 or 2007, and that when she brought it to his attention, he did not correct the overpay. Ammons began investigating this overpay allegation.

Two days later, on July 8, Ammons again met with Debord about the Facebook posts. For a third time, she denied making the posts, so Ammons explained that Mercy would have to spend a lot of money to find the real culprit unless she confessed. Debord finally owned up to her conduct, and Ammons informed her she would be suspended for one day without pay for "[f]ail[ing] to conduct yourself in a manner consistent with a high degree of personal integrity and professionalism." *Id.* at 288.

Before ending the meeting, Ammons asked about the "creepy hands" comment at the end of Debord's posts. Ammons said this comment concerned him most. Debord then told Ammons that Weaver touched her and a lot of the

women in the department with his cold hands. Ammons asked if she thought it was sexual harassment, and she replied that she did not think so—she just thought that Weaver was a "pervert." *Id.* at 233–34. Ammons said that Weaver's behavior was "inappropriate" and "should never happen," and that he would have Mercy's risk manager, Lana Brewster, investigate the matter to see if there was "any potential for sexual harassment." *Id.* at 166, 234–35. Meanwhile, he continued investigating Debord's claim that Weaver added money to her paycheck.

### C. Mercy's Investigation

The next day, July 9, Debord met with Brewster. Brewster said she was there to talk about Debord's sexual harassment complaint, but Debord denied having made a sexual harassment complaint; she said she had only answered Ammons's questions. Brewster asked Debord what she meant by the "creepy hands" post on Facebook. Debord described Weaver's "daily touching" of her arm or neck with his cold hands, in addition to two sexual remarks Weaver had made to her. *Id.* at 188–89. Brewster asked Debord if she wanted to file a formal complaint, but Debord declined. Brewster then told Debord to let her know if there were any more problems. Debord assured Brewster that the touching and comments "probably wouldn't happen again." *Id.* at 188.

That same day, Brewster also interviewed a long-time, female employee in Weaver's department. This employee denied the existence of any hostility or sexual tension in the department.

Also on that day, Brewster interviewed Weaver. He did not confirm making any sexual remarks to Debord but admitted to occasionally touching her and other employees on the arm to show them how cold his hands were. Brewster told him "if anything was going on to cease." *Id.* at 570. Based on these interviews, she concluded that Weaver had not violated company policy.

### D. Debord's Termination

By July 13, Ammons determined that Debord's overpay claim was false. He also learned that Debord was sending messages to other employees in which she accused Weaver of destroying the overpay evidence. This troubled Ammons because he already told Debord that the overpay evidence was in his, not Weaver's, possession. Further, he learned that Debord's comments about the overpay and the related investigation had disrupted the workday for many hospital employees. Ammons thus decided, after conferring with Mercy's CEO and COO, to terminate Debord. Later that day, he told Debord she was terminated for disruption, inappropriate behavior, and dishonesty.

### E. Procedural History

Debord filed suit against Mercy for sex discrimination and retaliation in violation of Title VII,[3] and she filed suit against Weaver for assault and battery. Weaver counterclaimed for defamation. Following discovery, all parties moved for summary judgment. The district court granted summary judgment against all claims and required each party to bear its own costs. *See Debord v. Mercy Health Sys. of Kan., Inc.*, 860 F. Supp. 2d 1263 (D. Kan. 2012) (summary judgment); Aplt. App. 764 (costs). Mercy made a special motion for costs as a prevailing party, which the court denied. Debord appealed the judgment on her sex discrimination and retaliation claims against Mercy; Mercy cross-appealed its denial of costs.[4]

We turn first to Debord's sexual harassment and retaliation claims. We conclude with a brief discussion of Mercy's cross-appeal for costs.

## II. Analysis

It is unlawful for an employer to permit sexual harassment in the workplace. *See* 42 U.S.C. § 2000e-2(a)(1); *see also Meritor Sav. Bank, FSB v.*

---

[3] Debord also filed a complaint with the Kansas Human Rights Commission (KHRC), but the KHRC did not have jurisdiction over the case because Mercy is a "sectarian employer" under Kansas employment law. *See* Aplt. App. 261, 294. *See generally Van Scoyk v. St. Mary's Assumption Parochial Sch.*, 580 P.2d 1315, 1318 (Kan. 1978).

[4] Weaver's counterclaim and Debord's claims against Weaver are not before this court.

*Vinson*, 477 U.S. 57, 66–67 (1986). It is also unlawful for an employer to retaliate against an employee for opposing sexual harassment in the workplace. *See* 42 U.S.C. § 2000e-3(a).

Here, Debord claims Mercy violated both provisions. She claims Mercy permitted sexual harassment in the workplace, and she claims Mercy terminated her for reporting it. The district court determined that Debord did not have enough evidence to merit a trial on either claim, so the court granted summary judgment in favor of Mercy on both. We review the district court's decision de novo. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).

### A. Sexual Harassment/Hostile Workplace

An employee who is sexually harassed by a supervisor may have a claim against the employer under Title VII of the Civil Rights Act. *See Meritor*, 477 U.S. at 66–67; *see also* 42 U.S.C. § 2000e-2(a)(1). Under Title VII, harassment is actionable only when it is "sufficiently severe or pervasive" such that a reasonable person would find the work environment to be hostile or abusive *and* the employee in fact perceived it to be so. *Meritor*, 477 U.S. at 67; *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

An employer may be directly or vicariously liable for a hostile workplace. To show direct employer liability, an employee must present enough evidence for a reasonable jury to find that the employer knew or should have known about the harassment but failed to stop it. *Burlington Indus. v. Ellerth*, 524 U.S. 742,

758–59 (1998). The "should-have-known" formulation is, in effect, a showing that the employer was negligent in failing to stop harassment.

Even without a showing of negligence, an employer can still be found vicariously liable for harassment committed by a supervisor against an employee. To avoid vicarious liability, an employer can take advantage of an affirmative defense—the *Faragher* defense—by showing both that the employer "exercised reasonable care to avoid harassment and to eliminate it when it might occur," and that the complaining employee "failed to act with like reasonable care to take advantage of the employer's safeguards." *Faragher*, 524 U.S. at 805.

Debord raises both theories—direct and vicarious liability. We review each in turn.

### 1. *Direct Employer Liability*

"An employer is directly liable for a hostile work environment created by any employee if the employer's negligence causes the actionable work environment." *Baty v. Willamette Indus.*, 172 F.3d 1232, 1241 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). "'An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it.'" *Id.* at 1241–42 (quoting *Ellerth*, 524 U.S. at 759).

### a. Actual Knowledge

Debord admits that Weaver never made his sexual comments or advances in front of Mercy's management, and she admits she never told management about the harassment. Instead, to prove actual knowledge, she relies on a former employee's complaint to management about Weaver's touching. The complaint was made in 2001, but Debord argues that the complaint shows Mercy actually knew of the sexual harassment Debord experienced from 2004 to 2009.

Evidence of the former employee's complaint comes from an internal email summarizing the results of the employee's exit interview. On the subject of Weaver's touching, the email states, "[Weaver] learned that the cold hands on [sic] is not appreciated." Aplt. App. 650. Nothing more is said on the subject.

"In determining whether to consider acts alleged by other employees, we look to '[t]he extent and seriousness of the earlier harassment and the similarity and nearness in time to the later harassment . . . .'" *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1147 (10th Cir. 2008) (quoting *Hirase-Doi v. U.S. W. Commc'ns*, 61 F.3d 777, 783–84 (10th Cir. 1995)), *abrogated on other grounds by Ellerth*, 524 U.S. 742, *and Faragher*, 524 U.S. 775).

On nearness in time, this prior event cannot support actual notice. Occurring three years prior to Debord's arrival, this notice of one instance of potential harassment of someone else cannot, without more, constitute actual notice of Debord's sexual harassment three years later. As to our requirement

-11-

that evidence be produced showing the extent, seriousness, and similarity of the misconduct, not much can be said to support actual notice either. The record discloses one employee complained in 2001, but we do not know where or how often Weaver touched the employee, nor whether the touching was considered sexual harassment. And there is no evidence Weaver made any sexual comments or advances with the 2001 employee, as he purportedly did with Debord.

Ammons's reaction to Debord's complaint also suggests that Mercy did not know about any sexual harassment. According to Debord's own testimony, Ammons was surprised when she told him about Weaver sexually harassing her, and Ammons had been working at Mercy since at least the late 1990s.[5]

In sum, Debord does not raise a genuine dispute about whether Mercy actually knew of her harassment prior to July 2009.

### b. *Constructive Knowledge*

Debord also fails to present sufficient evidence showing Mercy should have known about the sexual harassment before July 2009.

"When a management-level employee has not been notified," as here, we apply "what amounts to a negligence standard: highly pervasive harassment should, in the exercise of reasonable care, be discovered by management-level

---

[5] It is true that, by the time of his deposition, Ammons knew that Weaver "puts his cold hands on—on other women, other people." Aplt. App. 547. But significantly absent from the record is any indication that Ammons knew of this conduct *prior* to Debord's Facebook post on July 6, 2009.

employees." *Tademy*, 614 F.3d at 1147 (internal quotation marks omitted). Obviously, then, to find constructive notice, we first must find harassment. Harassment has both objective and subjective components. *Morris v. City of Colorado Springs*, 666 F.3d 654, 663 (10th Cir. 2012). For the objective component, we look to the "totality of the circumstances" and "consider[] such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 664 (internal quotation marks omitted). For the subjective component, we look to see if the victim perceived the environment to be abusive. *Id.* at 665.

After an employee establishes the existence of harassment, we look to see whether the incidents of harassment were "so egregious, numerous, and concentrated as to add up to a campaign of harassment that the employer will be culpable for failure to discover what is going on." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 675 (10th Cir. 1998) (internal quotation marks and alteration omitted); *cf. Harsco Corp. v. Renner*, 475 F.3d 1179, 1188 (10th Cir. 2007). Only then do we find constructive notice. *Adler*, 144 F.3d at 675.

Debord claims Weaver touched at least six other female co-workers. But she provides the statements of only three co-workers, and these statements do not demonstrate that incidents of sexual harassment were "so egregious, numerous, and concentrated" as to create a jury question on constructive notice. *Id.* The

-13-

three co-workers testified that Weaver showed them his cold hands by touching their forearms or necks. But they did not testify that the touching was sexual harassment; in fact, one explicitly dismissed Weaver's touching as not "sexual." *See* Aplt. App. 633. Although this co-worker considered Weaver's behavior inappropriate *after* learning about Debord's lawsuit, she testified that, *before* the suit, "[i]t didn't seem like [Weaver] was crossing the line." *Id.* at 635. And while another testified that the touches were unwelcome, *id.* at 642, and a third testified that the touches made her feel uncomfortable, *id.* at 612, not one of Debord's co-workers said that Weaver had sexually harassed her, nor did any say that she reported his behavior.

Debord also offered evidence from an employee who worked under Weaver between 1994 and 1998—years before Debord's employment. This former employee testified that Weaver regularly put his cold hands on her neck, but she also did not report these episodes to management at the time.

A comparison between this case and *Hirase-Doi* is instructive. In that case, we found a genuine factual dispute on constructive notice because the plaintiff introduced evidence showing that "as many as eight to ten [female] employees" were being sexually harassed during one male employee's three-month tenure. 61 F.3d at 784. The male employee made "persistent requests for sex and inquiries of [female employees'] sexual conduct," as well as "open-ended invitations to all female employees to satisfy his sexual desires" and "threatening and intimidating

-14-

stares." *Id.* at 780. Worse, he "passed a sexually explicit note," "attempted to kiss [another] on the neck and brushed her breast with his hand," and "grabbed [yet another female employee] between her legs." *Id.* at 781. By contrast, the allegations in this case do not constitute a similar "campaign of harassment" blatantly obvious to management. *Adler*, 144 F.3d at 675.

In sum, the sexual harassment borne out by Debord's evidence does not rise to the level of "egregiousness" and "pervasiveness" that creates a genuine dispute on constructive notice. *Tademy*, 614 F.3d at 1147.

We now turn to whether Mercy may nevertheless be vicariously liable for Weaver's behavior.

### 2. *Vicarious Liability*

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807. But when no tangible employment action is taken, as here, an employer may defeat liability by showing it took reasonable steps to avoid a hostile workplace by adopting policies available to employees to report harassment—the *Faragher* defense. *See id.*

The *Faragher* defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take

advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir. 2011) (citation and internal quotation marks omitted). These two elements are designed to "encourag[e] forethought by employers and saving action by objecting employees." *Faragher*, 524 U.S. at 807.

### a. First Element—Prevention and Correction

The first element of the *Faragher* defense "actually imposes two distinct requirements on an employer": "(1) the employer must have exercised reasonable care to prevent sexual harassment and (2) the employer must have exercised reasonable care to correct promptly any sexual harassment that occurred." *Helm*, 656 F.3d at 1288 (citing *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1062 (10th Cir. 2009)).

***Prevention.*** "[An] employer[] act[s] reasonably as a matter of law [to prevent harassment if it] adopted valid sexual harassment policies [and] distributed those policies to employees via employee handbooks, [even if it] either provided no sexual harassment training or provided training only to managers." *Id.* at 1289. In *Helm*, the employer's policy "prohibit[ed] sexual harassment, contain[ed] a complaint procedure and [a] list of personnel to whom harassment may be reported, and include[d] an anti-retaliation provision." *Id.* at 1288. The employer then "distribut[ed] that policy to all employees via an employee handbook, requir[ed] employees to acknowledge in writing their

-16-

understanding of the policies contained in the handbook, and provid[ed] training to managers regarding the sexual harassment policy." *Id.* at 1289. We concluded that the *Helm* employer's sexual harassment policy was "a reasonable mechanism for prevention." *Id.* at 1290 (internal quotation marks omitted).

Debord does not challenge the content or distribution of Mercy's sexual harassment policy. Rather, she says the fact that Weaver sexually harassed her shows the inadequacy of Mercy's efforts to prevent sexual harassment. But a plaintiff must do more than merely allege harassment to defeat this element of the *Faragher* defense. Otherwise, the *Faragher* defense would not work.

Given this obstacle, Debord also argues that Mercy's policy is "*per se* ineffective" because one manager, Brewster, testified that the policy prohibits only "intimate touching." Aplt. Br. at 36; Reply Br. at 7. But Brewster's testimony was *not* that Mercy's policy prohibited only intimate touching. Rather, in discussing Mercy's sexual harassment policy, Brewster verified that the policy prohibited a range of conduct, including "discuss[ing] sexual activities, tell[ing] off-color jokes, and touch[ing] unnecessarily." Aplt. App. 566. Brewster then testified that "[i]f it were intimate touching," she would consider the conduct a violation of the policy. *Id.* And, in fact, Mercy treated Debord's allegation of unwanted touching as an allegation of sexual harassment.

Mercy has shown that it "adopted valid sexual harassment policies [and] distributed those policies to employees via employee handbooks." *Helm*, 656

F.3d at 1289. The prevention component of the *Faragher* defense does not require more.

***Correction.*** The second requirement is whether an employer can "show that it acted reasonably promptly on [an employee's] complaint when it was given proper notice of her allegations as required under its complaint procedures." *Id.* at 1290 (internal quotation marks omitted). Obviously, the "most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Id.* (internal quotation marks omitted).

No genuine dispute exists here that Mercy's corrective measures were sufficient. As outlined above, Mercy acted "reasonably promptly" after learning of Debord's allegations on July 8 by launching an immediate investigation. As soon as he learned of Debord's allegations, Ammons referred the matter to Brewster, and Brewster promptly investigated the allegations.

Debord claims that is not enough. She claims Brewster acted unreasonably because (1) Weaver was not disciplined, (2) Brewster did not believe that Debord made a sexual harassment complaint in the first place, and (3) Brewster misled Debord into thinking there was an actual complaint form when no such form existed. Thus, says Debord, Mercy's efforts were insufficient to correct sexual harassment.

Debord's arguments do not raise a genuine dispute of material fact. First, corrective action does not always require discipline. *Cf. Pinkerton*, 563 F.3d at 1062–63 (finding "no genuine issue left" on whether the employer promptly corrected a harassment claim where "[t]he alleged harassment . . . ceased—without resuming—after [the] complaint," the plaintiff did not then request any immediate corrective action, the employer launched a prompt investigation anyway, and the matter was resolved "in a matter of weeks"). Second, Brewster investigated Debord's complaint, even though Debord denied making a sexual harassment complaint at the time. And third, Debord did not need a written form; she had Mercy's HR Director (Ammons) and risk manager (Brewster) asking her to file a complaint, and she declined their offers. No genuine issue of material fact remains as to the adequacy of Mercy's corrective measures.

### b. *Second Element—Unreasonable Delay*

An employer may satisfy the second element of the *Faragher* defense "by showing that the victimized employee unreasonably delayed in reporting incidents of sexual harassment." *Helm*, 656 F.3d at 1291.

The district court correctly concluded that Mercy meets the second element. In *Pinkerton*, we found "a reporting delay of approximately two or two and a half months" unreasonable where the plaintiff's only explanation was a "generalized fear of retaliation," and the plaintiff "had received the harassment training and knew that the incidents should have been reported." 563 F.3d at 1063–64. Here,

-19-

the reporting delay spanned *five years*—Debord did not report the harassment from 2004 until 2009—and that amount of delay is unreasonable.

Debord's explanation for her delay is (1) she did not know it was harassment at the time, and (2) she thought the complaint would have been futile because Weaver's wife was one of the hospital's two surgeons.

Debord's first explanation suggests either that Weaver's behavior was not harassment at all (because Debord did not subjectively experience it as harassment) or that Debord unreasonably failed to consult the sexual harassment materials provided to her by Mercy. Either way, this explanation does not justify her failure to report Weaver's behavior to management.

Her second explanation is also inadequate. A failure to report harassment cannot be excused merely because the accuser believes the report will be futile; the accuser's belief must be reasonable. But saying that the accused's spouse is also employed by the hospital—without more—does not establish objective futility. *See Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001) ("We cannot accept the argument that reporting sexual harassment is rendered futile merely because members of the management team happen to be friends."). Besides, Debord does not dispute that Mercy offered an anonymous reporting system, and Debord has not offered a reasonable explanation for failing to use even that. Nor does she show any evidence that action would not be taken; to the contrary, her reports to HR prompted an immediate response.

In sum, Mercy cannot be held vicariously liable. Debord stayed silent even after Mercy provided sexual harassment training, annual reminders, an open-door policy with the management team, and an anonymous hotline to report harassment. Her sexual harassment claim fails to raise a disputed, material fact.

We now turn to Debord's retaliation claim.

### B. Retaliation

Debord also claims Mercy fired her as retaliation for her complaint about sexual harassment in the workplace. Where, as here, the plaintiff does not have direct evidence of retaliation, we follow the three-step framework from *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, Debord must present a prima facie case for retaliation. Next, Mercy must respond with "legitimate, nonretaliatory reason[s]" for Debord's termination. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011). Then Debord must show that Mercy's stated reasons were pretextual. *Daniels*, 701 F.3d at 639.

Like the district court below, we assume without deciding that Debord made a prima facie case for retaliation. And Debord does not dispute that Mercy proffered legitimate, nonretaliatory reasons for terminating her. Rather, Debord claims that Mercy's proffered reasons are mere pretext for Mercy's actual intention to punish her for reporting sexual harassment.

"To show pretext, [Debord] must produce evidence showing weakness, implausibility, inconsistency, incoherency, or contradiction in [the employer's]

-21-

stated reasons, such that a reasonable jury could find them unconvincing." *Id.*
"'In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*,'" not as they appear to the plaintiff. *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011) (internal quotation marks omitted; emphasis in original). And we do not ask "whether the employer's proffered reasons were wise, fair or correct"; we ask only "whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Id.* at 1094 (internal quotation marks omitted).

Ammons's stated reasons for terminating Debord were her inappropriate, disruptive behavior and her dishonesty. Debord does not dispute these charges. She admits posting inflammatory material about her supervisor on the internet, sending text messages to co-workers bad-mouthing her supervisor (unrelated to the alleged sexual harassment), discussing the overpay and harassment investigations with others, knowingly pocketing overpayment in 2007, and thrice lying about posting information on Facebook while at work. No reasonable jury could find these reasons "unconvincing." *Daniels*, 701 F.3d at 639. Thus, no reasonable jury could find pretext.

Debord's many arguments to the contrary do not raise a genuine dispute of material fact. She argues that (1) Ammons willfully ignored evidence of her 2007 overpay, (2) Ammons could not lawfully terminate her for using Facebook to air her complaints, (3) Ammons's stated reasons for her termination are vague and

-22-

subjective, (4) Ammons could not lawfully terminate her for making a false sexual harassment claim, (5) Ammons could not lawfully terminate her for communicating with others about the pending investigations, and (6) Mercy's management failed to investigate her sex-based pay-disparity claim.

*First*, Debord claims Ammons willfully ignored evidence showing that she had been overpaid. Ammons testified—and Debord does not dispute—that he reviewed call-back logs and pay stubs from 2006, and they do not show overpay. Therefore, as of July 13, 2009 (the date of Debord's termination), he reasonably believed that Debord's overpay claim was false. This belief was one reason that Ammons cited for why he considered Debord to have been dishonest.

Months later, however, Mercy's management discovered that, according to the logs and pay stubs for 2007, Debord had in fact been overpaid. Debord argues that Ammons's failure to review the 2007 documents demonstrates pretext.

But Debord does not dispute that she mentioned only 2006 at her second meeting with Ammons, the July 8 meeting—two days after she first told him "2006 or 2007." Aplt. App. 463. At most, this evidence suggests Ammons's failure to review documents from 2007 resulted from negligence, forgetfulness, or confusion—not intentional ignorance to hide a retaliatory motive against Debord for her sexual harassment complaint.

*Second*, citing *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325 (2011), Debord argues that terminating her for her post on Facebook was

*per se* unlawful because that was her way of reporting sexual harassment.[6] And she says Mercy made up this reason *post hoc* anyway because her termination slip does not specifically reference those posts.

In *Kasten*, the Supreme Court held that the antiretaliation provision of the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3), protects oral as well as written complaints. The Court therefore reversed summary judgment for the employer where the employee orally called attention to unlawful practices, and where, significantly here, the employee did so "in accordance with [the employer's] internal grievance-resolution procedure." *Id.* at 1329. The Court later observed that "it is difficult to see how an employer who does not (or should not) know an employee has made a complaint could discriminate *because* of that complaint." *Id.* at 1335 (emphasis in original).

Under the logic of *Kasten*, Debord's sexual harassment complaint—*i.e.*, her Facebook post—falls short. Her Facebook post was not in accordance with Mercy's otherwise flexible reporting system for sexual harassment complaints, and the post, by itself, did not provide any notice to Mercy. Only when Weaver

---

[6] In a footnote, she also cites *Gresham v. City of Atlanta*, No. 1:10-CV-1301-RWS-ECS, 2011 WL 4601022 (N.D. Ga. Aug. 29, 2011) (magistrate judge's recommendation), and *Mattingly v. Milligan*, No. 4:11CV00215JLH, 2011 WL 5184283 (E.D. Ark. Nov. 1, 2011), saying these decisions show that "similar complaints on Facebook . . . deserve protection." Aplt. Br. at 49 n.3. But these unpublished opinions address First Amendment protection for Facebook posts related to matters of a public concern. These decisions are therefore irrelevant to this case, as Debord neither has raised a First Amendment claim nor has argued that her posts are related to a matter of public concern.

himself brought the post to Ammons's attention did Mercy learn that, among many other complaints, Debord disliked Weaver's "creepy hands." And even then, Debord thrice denied authoring the post. No jury could conclude that Mercy's management acted unreasonably in response to Debord's Facebook post. *Cf. Helm*, 656 F.3d at 1291 (concluding it was "entirely reasonable" not to investigate allegations of sexual harassment when the plaintiff told her employer she "did not wish to pursue her complaint").

Besides, Ammons's decision to terminate Debord did not turn on whether she aired her grievances on Facebook; instead, the decision turned on her dishonesty about authoring the posts while at work and her disruptive behavior during the investigation. Debord cannot dispute that dishonesty is a valid ground for terminating an employee. Nor can she genuinely dispute that she behaved inappropriately and disruptively by, for example, sending messages to co-workers about confidential investigations in contravention of Mercy's policies.[7]

*Third*, Debord says that Ammons's stated reasons for terminating her are vague and subjective and therefore point to pretext. But the "dishonesty" here is

---

[7] Debord contends that Ammons was inconsistent about when he told her to keep the matter confidential and that a call log shows he is not telling the truth. But Ammons consistently testified that he called Debord *before* she sent text messages; it is Debord who said he did not call until *after* she sent the messages. And we cannot deduce from the numbers in the call-log exhibit who called whom. In any event, the record shows that Ammons told Debord to keep the investigation confidential, and later he learned that Debord sent co-workers text messages about the investigation anyway. Because we decide pretext based on what Ammons knew at the time, we cannot say these arguments raise a jury question.

not subjective at all, as Debord already conceded she lied. And "inappropriate and disruptive behavior" is not vague, given the context.

Nor do the cases Debord cites demand a different result. In *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108 (10th Cir. 2007), for example, the employee's evidence of pretext was that the investigation into her misconduct focused on whether or not she had been rude to a customer. This, the employee argued, was subjective and hence pretextual. We disagreed. We noted that "the existence of subjective criteria alone is not considered evidence of pretext." *Id.* at 1120. We then affirmed summary judgment for the employer because the employee did not present evidence that similarly situated employees were treated differently, nor did she present evidence that others in management "deliberately withheld information" or otherwise misled the decisionmaker. *Id.* Likewise, Debord has not shown that similarly situated employees were treated differently or that Brewster withheld information from or otherwise misled Ammons.

In the other case Debord cites, *Hurlbert v. St. Mary's Health Care Sys.*, 439 F.3d 1286 (11th Cir. 2006), the plaintiff's termination slip omitted the reasons for his termination, and the plaintiff's termination process conflicted with the employer's usual practice. *See id.* at 1298–99. By contrast, here, Debord's termination slip contained the reasons for her termination, and she has not shown that Mercy deviated from its usual disciplinary practices.

*Fourth*, citing an Eighth Circuit case, Debord says Mercy is not entitled to summary judgment when one of Ammons's reasons for terminating her was the falsity of her sexual harassment complaint. *See Pye v. Nu Aire, Inc.*, 641 F.3d 1011 (8th Cir. 2011). In *Pye*, the Eighth Circuit found a genuine issue of material fact when the employer's sole reason for terminating the plaintiff was the plaintiff's complaint of racial discrimination in the workplace. *See* 641 F.3d at 1021. But here, Ammons had a number of reasons—unrelated to Debord's complaint of sexual harassment—to support his conclusion that Debord's behavior was inappropriate, disruptive, and dishonest.

*Fifth*, Debord argues that terminating her for her disruptive text messages was pretextual because she was merely communicating about a pending investigation into harassment. She points to *Loudermilk v. Best Pallet Co.*, 636 F.3d 312 (7th Cir. 2011), where the employer terminated the plaintiff for taking photographs at work. The Seventh Circuit concluded the employer evinced a retaliatory motive. The court reasoned, "If . . . Loudermilk snapped the photos [in order] to bolster his claim of discrimination, then forbidding picture-taking looks a lot like an attempt to block the gathering of evidence during an investigation." *Id.* at 315.

Here, instead of trying to gather evidence, Debord's text messages merely shared information with co-workers about an investigation that company policy dictates should be confidential. For example, Debord sent: "[Weaver] emptied

out the drawer where all the call back papers were kept at work. Guilty as charged!" Aplt. App. 301. And: "To get rid of them. He's being investigated . . . but he doesn't know it. [Ammons] will be calling the techs . . . asking about his conduct . . . the lewd comments and t[]ouching." *Id.* at 302–03. Debord is not gathering evidence with these messages.

Further, unlike the employer's no-photography rule in *Loudermilk*, Mercy's confidential-investigation rule was not generated after the fact. In fact, the rule is stated in Mercy's harassment training materials. Debord had received this training, the materials were available online, and Debord does not allege that this policy was only selectively enforced. Debord cannot show pretext here.

*Sixth* and finally, Debord claims Mercy failed to investigate Debord's allegation that a male co-worker made more money than she did. But Debord did not raise this argument before the district court, so we will reverse only if Debord "shows the district court's decision amounted to plain error." *Somerlott v. Cherokee Nation Distribs.*, 686 F.3d 1144, 1148 (10th Cir. 2012). This Debord cannot do, because she did not present evidence that her pay-disparity complaint was ignored. Instead, she admitted that "the reason" Ammons first agreed to meet with her on July 6 was to discuss her claim of disparity in pay, Aplt. Br. at 52, and that shows good faith on Ammons's part, not pretext.

In sum, it is not reasonable to conclude Ammons fired Debord because she exercised her right to report sexual harassment. There were many nonretaliatory

-28-

reasons for terminating Debord, and Mercy's management investigated the sexual harassment complaint even when Debord did not pursue the claim herself. Accordingly, we affirm the district court's grant of summary judgment for Mercy.

### C. Cross-Appeal: Costs

After granting summary judgment against all claims, the district court, without explanation, ordered each party to bear its own costs. Having completely prevailed, Mercy filed a post-judgment motion for costs. The court denied the motion because co-defendant Weaver lost his counterclaim against Debord, and Weaver and Mercy shared counsel. Mercy cross-appeals for costs.

Debord contends that Mercy's post-judgment motion was untimely. Before the district court, Mercy styled its motion as a Rule 59(e) motion to alter or amend a judgment. But as Debord points out, the Supreme Court declared in *Buchanan v. Stanships, Inc.*, 485 U.S. 265 (1988), that a motion for costs "does not seek 'to alter or amend the judgment' within the meaning of Rule 59(e). Instead, such a request for costs raises issues wholly collateral to the judgment in the main cause of action, issues to which Rule 59(e) was not intended to apply." *Id.* at 268–69. Thus, according to Debord, Mercy's motion should be treated as a Rule 54(d)(1) motion, and as such, it had to be filed 7 days after the clerk's entry of judgment. *See* Fed. R. Civ. P. 54(d)(1) ("[C]osts . . . should be allowed to the prevailing party. . . . The clerk may tax costs on 14 days' notice. On motion served within the next 7 days, the court may review the clerk's action.").

-29-

Because Mercy filed its motion 21 days after the entry of judgment, Debord concludes the motion was untimely.

We need not decide the timeliness of Mercy's costs motion because, even if the motion was untimely, the district court had discretion to consider it. *See Quigley v. Rosenthal*, 427 F.3d 1232, 1237 (10th Cir. 2005) ("We review for abuse of discretion a district court's decision whether or not to consider such an untimely motion."). And here, the court properly exercised that discretion. We presume a prevailing party is entitled to costs. *Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 721–22 (10th Cir. 2000). Thus, while the district court may still withhold costs from a prevailing party, the court must provide valid reasons for doing so. *Id.* When a district court denies the prevailing party costs without explanation, we vacate the costs decision and remand for an explanation or reconsideration. *See, e.g.*, *Utah Animal Rights Coal. v. Salt Lake Cnty.*, 566 F.3d 1236, 1245 (10th Cir. 2009). And here, in its original judgment, the court did not explain why it denied costs to Mercy. Therefore, for efficiency's sake, it was proper for the district court to rectify that omission by responding to Mercy's post-judgment motion for costs.

That said, the district court's reasons for denying Mercy costs were invalid. "[T]o deny a prevailing party its costs is 'in the nature of a severe penalty,' such that there 'must be some apparent reason to penalize the prevailing party if costs are to be denied.'" *Marx v. Gen. Revenue Corp.*, 668 F.3d 1174, 1182 (10th Cir.

2011) (quoting *Klein v. Grynberg*, 44 F.3d 1497, 1507 (10th Cir. 1995)). Thus, the district court's discretion to deny the prevailing party costs is "not unlimited." *Cantrell v. Int'l Bhd. of Elec. Workers, AFL-CIO, Local 2021*, 69 F.3d 456, 458 (10th Cir. 1995) (en banc). The circumstances in which a district court may properly deny costs to a prevailing party include when (1) the prevailing party is "only partially successful," (2) the prevailing party was "obstructive and acted in bad faith during the course of the litigation," (3) damages are "only nominal," (4) the nonprevailing party is indigent, (5) costs are "unreasonably high or unnecessary," or (6) the issues are "close and difficult." *See id.* at 459.

The district court here offered none of those reasons. Instead, relying on our decision in *Roberts v. Madigan*, 921 F.2d 1047 (10th Cir. 1990), the court reasoned that denying costs to Mercy is appropriate because "'both parties have "prevailed" on at least one claim,'" which, according to the district court, happened here because Debord prevailed against Weaver's counterclaim, even though she lost all her claims against Mercy and Weaver. Aple. App. 1014 (quoting *Roberts*, 921 F.2d at 1058). The court further reasoned that separating Mercy and Weaver's defense costs from Weaver's counterclaim costs would have been "impracticable" given that Mercy and Weaver shared counsel and relied on overlapping facts. Aple. App. 1015.

These reasons do not justify withholding costs from Mercy. The court's reliance on our decision in *Roberts* is misplaced, because in *Roberts*, we upheld a

-31-

costs award to a prevailing defendant where it prevailed "on the vast majority of issues and on the issues truly contested at trial." 921 F.2d at 1058. Here, by contrast, Mercy prevailed on *all* issues, and yet the district court *denied* Mercy costs. While perhaps applicable to Weaver, *Roberts* does not apply to Mercy.

The district court's other reasons are not supportive either. We do not want to discourage an efficient allocation of resources, so merely sharing counsel with a co-defendant who files an unsuccessful counterclaim does not make a fully prevailing party ineligible for costs. And overlapping facts may justify deducting some costs during the taxing process, but it is not a basis for altogether denying a prevailing party costs. After all, Debord brought Weaver into the case as a co-defendant, and Weaver chose to bring a counterclaim; Mercy had no say, as far as we can tell, in either decision.

In sum, the district court did not provide an adequate basis for refusing costs to Mercy.

## III. Conclusion

For the foregoing reasons, we AFFIRM the order of the district court granting summary judgment to Mercy, and we REVERSE the entry of judgment requiring each party to bear its own costs and REMAND to provide Mercy with an opportunity to submit a bill of costs consistent with this opinion.